Exhibit 1

# TERMS & CONDITIONS–PLEASE READ CAREFULLY

## How to make your reservation

To make your reservation, see your travel agent or, for more information, visit our website at www.globusjourneys.com.

## Deposit and final payment

We accept checks, money orders, Visa, MasterCard, Discover/Novus, and American Express. Your payment is not deemed made until it is received by Globus.

A non-refundable deposit of $200 per tour and person is required for us to reserve space for you. For group reservations, travel agents should refer to the Group Policy Booklet, which may be requested by mail, fax or email. Final payment is due 45 days (90 days River cruises, W-coded) prior to commencement of services. If we do not receive final payment by this date, we reserve the right to cancel the reservation. In the case of billing errors, we reserve the right to reinvoice with correct pricing. Payment in full is evidenced at time of booking for reservations made less than 45 days before departure. In order to secure space, your travel agent should advise Globus of your credit card number when phoning in your reservation. Payment of the deposit means you've read and accepted these terms and conditions.

Acceptance on the tour is subject to presentation of the Tour Member Certificate.

## Cancellations and cancellation fees

If cancellation is received by Globus more than 45 days (90 days River cruises) prior to commencement of services, your deposit will be retained. For individual reservations, the following per person cancellation fees apply (For group reservations, refer to the Group Policy Booklet.)

45-22 days prior to commencement of services:
20% of total price

21-8 days prior to commencement of services: 30% of total price

7-1 days prior to commencement of services: 50% of total price

On departure day and later:
100% of total price

River Cruises:

90-60 days prior to commencement of services:
33% of total price

59-30 days prior to commencement of services:
50% of total price

29-1 days prior to commencement of services: 80% of total price

On departure day and later:
100% of total price

Cancellation fees may also apply to any additional services, including accommodations, independently supplied services and optional excursions, reserved prior to, during and after the vacation.

If flight changes, including flight cancellations, are requested, revision fees or airline cancellation fees will apply. If an air-inclusive tour is canceled after air tickets have been issued, refunds will be processed after air tickets are returned to Globus.

Globus reserves the right to cancel or re-schedule any vacation departure. If cancellation is made prior to departure, the only responsibility of Globus will be to refund to the passenger the amount we have received for the reservation. We will try to re-book the same vacation with a different departure date, or a similar tour. Where Globus has confirmed flights, we will try to confirm air seats for the selected new dates, subject to availability. Globus cannot assume responsibility for any additional costs or any fees relating to the issuance and/or cancellation of air tickets or other travel arrangements not made through Globus.

## Revision fees

A fee of $30 per transaction will be charged for any alteration or revision made to a reservation. Airline penalties may also apply. A change of traveler name, tour date or tour itinerary within 45 days (90 days River cruises) of commencement of services will be treated as a cancellation and new reservation; standard cancellation fees apply.

## Participation

For the benefit of everyone on your vacation, Globus reserves the right to accept or reject any person as a tour participant, and to remove from the tour any participant whose conduct is deemed incompatible with the interests of the other participants.

## Travelers who need special assistance

You must report any disability requiring special attention to Globus at the time the reservation is made. Globus will make reasonable attempts to accommodate the special needs of disabled travelers,

but is not responsible in the event it is unable to do so, nor is it responsible for any denial of services by carriers, hotels, restaurants, or other independent suppliers. Be aware that outside the U.S. the Americans with Disabilities Act is not applicable and facilities for disabled individuals are limited. Most transportation services including the touring motorcoach, are not equipped with wheelchair ramps. We regret that we cannot provide individual assistance to a vacation participant for walking, dining, getting on and off motorcoaches and other vehicles, or other personal needs. A qualified and physically able companion must accompany travelers who need such assistance, and must assume total responsibility for the handicapped participant's well-being. Motorized scooters are unsuitable for vacations in Europe and Africa. River cruise ships do not have elevators. Cabin doors and restrooms are not wide enough to allow access by standard wheelchairs and bathrooms and other doorway may be fitted with coamings. For safety reasons passengers in wheelchairs cannot be carried on ramps in ports where the ship is at anchor.

## Young travelers

Travelers who are less than 18 years old on the departure date must be accompanied by an adult; they receive a 10% discount on the land tour price. We do not accept children who are less than eight years old. On our Monograms—Independent Vacations there is no age restriction: land arrangements for infants under two are free of charge, providing parents pay directly to the hotels for food, crib, etc. Special discounts apply to Monograms Independent Vacations, see page 236. For any special requirements regarding airline tickets for children, contact your airlines directly.

Due to heightened security, many countries have adopted practices to prevent international abductions of children. If a child will be traveling with adults other than the parents or with only one parent, it is recommended that a notarized letter be written by the parents or non-traveling parent granting authorization to travel, including the dates of travel. We suggest that you also contact the appropriate consulate and airlines because they may have additional requirements.

## Smoking

Smoking is not allowed on transportation that is exclusively provided by Globus.

## Price Guarantee

All vacation prices are based on rates (including foreign exchange rates) known at the time of printing and expected to be in effect at the time of departure. Prices are subject to increase without notice if such rates change prior to departure. The current price will be confirmed at the time of reservation. However, once Globus has received your deposit for any vacation departing in 2006, that land price is guaranteed, and any subsequent land cost increases are at our expense, not including surcharges and any government tax increases. Airfares included as part of air-inclusive tour prices are guaranteed when we receive full payment. Vacation prices are per person, based on double occupancy. Single room supplements and triple room reductions are listed where applicable.

## Visas & Passports

For vacations requiring visas for U.S. citizens, detailed visa information will be mailed or faxed. You are responsible for obtaining all visas and entry documents, and for meeting all health and other requirements and any documents required by laws, regulations, orders and/or requirements of the countries to be visited. Multiple-entry visas are required for some vacations. Non-U.S. citizens must consult with appropriate consulates to determine if any visas are needed and are responsible for obtaining and payment for all visas and entry documents. All passengers traveling internationally are required to have a passport. Most countries require that the passport be valid for at least six (6) months beyond the conclusion of your trip.

## Accommodations

The accommodations listed in this brochure are intended to be used on all departures; however, if a change becomes necessary for any reason, the accommodations substituted will be equivalent in standard to those shown. Every effort is made to reserve only twin-bedded rooms. It may occasionally happen that an accommodation provides some double-bedded rooms instead. These rooms will be allocated to couples.

Please note that accommodation check-in times vary worldwide.

## Private bath and single rooms

In exceptional cases where private bath or single rooms as reserved by us are not available, refunds will be made by the tour director or local hotel. Claims made in this respect cannot be accepted after the vacation is completed.

## Baggage allowance

Porterage for one suitcase on vacation is included in the vacation price. Airport porterage at the beginning and end of the vacation is not included. Due to limited coach capacity, this single bag should have dimensions not exceeding 30"x21"x11" and weight not exceeding 50 lbs. (22kg) or less if your air carrier has stricter weight/dimension limitations. We regret we are unable to accept a second suitcase, or any baggage exceeding these limits. We recommend you consult your air carrier as size and weight limitations vary from airline to airline and even according to destination, and are becoming more restrictive. Globus is not responsible for additional fees imposed by air carriers. Regulations within most airports require that travelers handle their own luggage through customs.

Globus will supply each traveler (except on Monograms Independent Vacations) with a complimentary travel bag, which can serve as your carry-on bag. Should you prefer to take along a different bag, it should not exceed the dimensions of 12"x11"x6".

For safety reasons, wheeled carry-on bags are not suitable as hand luggage on motorcoaches and mini-buses.

No responsibility is accepted for loss of or damage to baggage or any of the tour participant's belongings. Baggage insurance is recommended. See the following page for an all-inclusive Travel Protection Plan.

## Travel documents

Travel documents, including any paper air tickets or e-ticket itineraries, are sent by regular ground delivery four weeks prior to tour departure, provided full payment has been received. A $15 charge per reservation is added for documents requested in advance or for two-day delivery in the continental USA. Please indicate at the time of reservation whether you prefer regular ground delivery or two-day delivery (Two-day delivery with related charges is required for reservations made within 45 days (90 days River Cruises) of commencement of services.)

## Not included in the tour price

Federal Inspection Fees for the Federal U.S. Customs and Immigration; International Air Transportation Tax; agricultural tax; any other taxes; security fee; airport taxes and fees; passports; visas and vaccinations; tips to your tour director; tour host, tour driver, local city guides; gratuities on ferries, trains and cruise ships; laundry; telephone; mini bar; alcohol, beverages and food not on the regular table d'hôte menu (these extra items will be billed to you before leaving the hotel or restaurant); optional excursions; porterage at airports; travel protection; excess baggage fees; all other items of a personal nature.

## Refunds

Please note that any request for refunds is subject to the terms and conditions of the brochure; no refund can be made for unused services of less than 48 consecutive hours, for unused transportation where group activity tickets are involved, or for voluntary modifications made by the traveler. Airport transfers are complimentary with all-inclusive bookings on qualifying flights. Customers not using the included transfer will not be given a cash equivalent or vacation price reduction.

## Service inquiries after the tour

If after returning from the vacation, you wish to inquire about any tour services provided, please ensure that all correspondence relating to those services is received by Globus, Traveler Services, Group Voyagers Inc. (see address right), within 60 days of the tour completion date. This will enable Globus to make a timely investigation.

## Holidays

During local or national holidays, certain facilities such as museums and restaurants, sightseeing tours and shopping may be limited or not available. Alternatives will be offered whenever possible.

## Itinerary changes–River Cruises

In the rare event of water level problems on stretches of any river, it may be necessary to operate part of the itinerary by motorcoach.

Globus reserves the right to change the itinerary whenever conditions, in the opinion of the Master of the Ship or local waterways regulations, render it advisable or necessary. Globus will not be responsible for any loss or expense caused by reason of such changes.

Globus reserves the right to cancel, advance or postpone any scheduled tour and/or sailing date and may, but is not obligated, to substitute another vessel and shall not be liable for any loss whatsoever to tour/cruise participants by reason of any such cancellation, advancement or postponement. In the event of cancellation by

Globus only tour/cruise participants' sole right of recourse shall be to a refund of monies paid to Globus in connection with such tour/cruise. In the event of charters of the vessel, strikes, lockouts, riots or stoppage of labor for whatever cause or for any other reason whatsoever, Globus may at any time cancel, advance or postpone any scheduled sailing and may, but is not obliged, to substitute another vessel and shall not be liable for any loss whatsoever to tour/cruise participants by reason of any such cancellation, advancement or postponement.

## Safety

Please be aware that during your participation in tours operated by Globus, certain risks and dangers may arise beyond our control including, but not limited to, the hazards of traveling in undeveloped areas; travel by boat, train, automobile, aircraft or other means of transportation; the forces of nature, political unrest, acts of terrorism and accident or illness in remote regions without means of rapid evacuation or medical facilities. Globus will not have liability regarding provision of medical care or the adequacy of any care that may be rendered. It is understood that Globus will use its best efforts to ensure that adequate measures are taken.

## Responsibility

Group Voyagers, Inc. located at 5301 South Federal Circle, Littleton, Colorado 80123, is an independent company ("the Company") licensed to market and distribute travel products under the Globus brand name, and arrange for the vacation services offered in this brochure, including transportation, sightseeing, and accommodations through independent contracts.

The carriers, accommodations, and other suppliers providing services are independent contractors and are not agents, employees, or servants of, or joint venturers with, the Company or its affiliates. All certificates and other travel documents for services issued by the Company are subject to the terms and conditions specified by the supplier, and to the laws of the countries in which the services are supplied. The Company will not assume responsibility for lost airline tickets or coupons.

If, after departure, the services included in the vacation cannot be supplied, or there are changes in an itinerary for reasons beyond the control of the Company, the Company will arrange for the provision of comparable services. Any resulting additional expense will be payable by travelers and any resulting saving will be refunded by the Company to vacation participants.

The Company reserves the right to accept or reject any person as a vacation participant, to expel any participant from the vacation, to make changes in the itinerary whenever the Company deems it necessary for the comfort, convenience, or safety of the participants, and to cancel a vacation at any time.

The vacation participant agrees that neither the Company nor its affiliates shall be liable for any damage, loss (including personal injury, death, and property loss) or expense occasioned by any act or omission of any supplier providing services, or any insurer or insurance administrator under the Travel Protection Plan, or of any other person.

Any dispute between the vacation participant and the Company directly or indirectly relating to the Terms and Conditions shall be first submitted to mediation at Denver, Colorado before a mediator mutually agreed to by the parties. If mediation is not successful, the dispute must be resolved by binding arbitration under Colorado law before the Judicial Arbiter Group or its successor located at 1601 Blake Street, Denver, Colorado 80202. The prevailing party shall be entitled to an award of costs and reasonable attorney's fees. Any action to enforce the arbitrator's decision shall be brought in the state or federal courts in the State of Colorado.

Arbitration against the Company must be commenced within one year following the date of tour completion. Neither the Company nor any affiliate shall in any case be liable for other than compensatory damages, and you hereby waive any right to punitive damages.

No person, other than an authorized representative of the Company, by a document in writing, is authorized to vary, add or waive any term or condition in this brochure, including any term or condition set forth in the preceding provisions.

## Trade name

Globus is a service mark registered in the U.S. Patent and Trademark Office.

The Avalon Waterways's *Poetry*, *Artistry* and *Symphony* vessels are also sold and operated in conjunction with our partner under the Amadeus Waterways brand name.

CST #2017032-20

GEU0625-US

Exhibit 2

*SEA DIAMOND*

## TERMS AND CONDITIONS OF CARRIAGE OF PASSENGERS AND THEIR LUGGAGE

---

These Terms and Conditions of Carriage set out the terms that govern the relationship, responsibilities and liabilities as between the Passenger and the Carrier and are BINDING ON THE PARTIES WHETHER YOU HAVE READ THEM OR NOT.

Where the Passenger has entered into a Passage Contract with an Organizer these Conditions have been incorporated into the Passenger's Contract with the Organizer.

These Terms and Conditions of Carriage will also apply where the vessel is being used as a floating hotel whether or not there is a Passage Contract and whether or not there is any carriage.

### Non-Transferability

The Passage Contract issued by the Organizer is valid only for the Passenger or Passengers for whom it is issued, for the date and vessel indicated, or any substitute vessel, and is not transferable.

These Conditions of Carriage set out the terms that apply between the Passenger and the Carrier.

1.  **Definitions** In these conditions and regulations the following expressions have the meaning hereby assigned to them:

    "**Carrier**" means the Owner or any Charterer, whether bareboat/demise Charterer, time charterer, subcharterer, or operator of the Vessel or provider of services or goods or any other person, to the extent that each of the above acts as carrier or performing carrier (in accordance with the definition provided in the Athens Convention).

    "**Passage Contract**" means the contract of carriage, that the Passenger has entered into with the Organizer the terms of which are evidenced by the Booking Terms and Conditions, which incorporate these Terms, and Conditions of Carriage.

    "**Luggage**" means any baggage, packages, suitcases, trunks, effects articles, matters or things belonging to or carried by any Passenger, including cabin luggage, hand luggage, articles worn by or carried on the persons of the Passenger, or deposited with the purser for safe custody, vehicles and any other property whatsoever. .

    "**Master**" means the master of the Vessel at any given point in time.

    "**Passenger**" includes the Purchaser of the Passage Contract and any person or persons named on the relevant passage ticket (including children), his or her or their guardians, executors, personal representatives, heirs and children or persons travelling with him or her or in his or her care.

    "**Shore Excursion**" means any excursion offered for sale by the Carrier for which a separate charge is payable, whether booked prior to commencement of the cruise or on board the Vessel.

    "**Vessel**" means the vessel named in the relevant passage contract or any substituted vessel owned or chartered or operated or controlled by the Carrier.

    "Organizer". An organizer is the Party with which the Passenger has entered into a contract for the cruise and/or a Package as defined under the Council Directive 90/314/EEC of 13 June

shall only be liable up to the limit provided in paragraph 3 of Article 8 of the Athens Convention.

(b)    The purser will also accept such articles in sealed packages, without charge, and will give a written receipt; but in this case neither he nor the Carrier will accept responsibility for loss of or damage to the deposited articles howsoever occurring.

36.  **Passenger's liability for damage**

36.1. The Passenger shall be liable for and shall reimburse the Carrier for any damage to the Vessel and/or its furnishings or equipment or any other property of the Carrier caused by any wilful or negligent act or omission by the Passenger or any person for whom the Passenger is responsible, including, but not limited to, children under the age of 18 travelling with the Passenger.

37.  **General Average**

37.1. The Passenger is not liable in respect of his or her Luggage or personal effects to pay, nor entitled to receive any General Average contribution.  However, other merchandise on board, whether accompanied or unaccompanied, will contribute to General Average.

38.  **No authority to vary conditions**

38.1. No person other than a Director of the Carrier has authority to vary these conditions and regulations and no such variation shall be of any effect unless it is in writing signed by such Director.

39.  **Place of proceedings**

39.1. Any action, suit or proceedings against the Carrier and/or its employees and/or the Vessel shall, unless the Carrier expressly agrees otherwise in writing, be brought in the Courts of Piraeus, Greece.

40.  **Law applicable:**

40.1. All disputes and matters howsoever arising between the Passenger and the Carrier in connection with the Carriage including, but without limitation, the execution of this Carriage, these Conditions and or anything done by the Carrier pursuant to or in connection with the provisions thereof, shall be subject to Greek law.

41.  **Conditions Severable**

41.1. Each of the provisions contained in these conditions and regulations shall be severable and if any of such provisions should be invalid, illegal or unenforceable the remaining provisions shall nevertheless have full force and effect.

42. **Applicability of Athens Convention**

    42.1. If the carriage provided hereunder is not an "international carriage" as defined in Article 2 of the Athens Convention or the Vessel is being used as a floating hotel, the remaining provisions of the Athens Convention shall apply to this Contract and be deemed to be incorporated herein, mutatis mutandis.

Exhibit 3

# APPENDIX U

## COUNCIL DIRECTIVE
### of 13 June 1990
### on package travel. package holidays and package tours

#### (90/314/EEC)

THE COUNCIL OF THE EUROPEAN COMMUNITIES,

Having regard to the Treaty establishing the European Economic Community, and in particular Article 100a thereof,

Having regard to the proposal from the Commission (¹),

In cooperation with the European Parliament (²),

Having regard to the opinion of the Economic and Social Committee (³),

Whereas one of the main objectives of the Community is to complete the internal market, of which the tourist sector is an essential part;

Whereas the national laws of Member States concerning package travel, package holidays and package tours, hereinafter referred to as 'packages', show many disparities and national practices in this field are markedly different, which gives rise to obstacles to the freedom to provide services in respect of packages and distortions of competition amongst operators established in different Member States;

Whereas the establishment of common rules on packages will contribute to the elimination of these obstacles and thereby to the achievement of a common market in services, thus enabling operators established in one Member State to offer their services in other Member States and Community consumers to benefit from comparable conditions when buying a package in any Member State;

Whereas paragraph 36 (b) of the Annex to the Council resolution of 19 May 1981 on a second programme of the European Economic Community for a consumer protection and information policy (⁴) invites the Commission to study, *inter alia*, tourism and, if appropriate, to put forward suitable proposals, with due regard for their significance for consumer protection and the effects of differences in Member States' legislation on the proper functioning of the common market;

Whereas in the resolution on a Community policy on tourism on 10 April 1984 (⁵) the Council welcomed the

Commission's initiative in drawing attention to the importance of tourism and took note of the Commission's initial guidelines for a Community policy on tourism .

Whereas the Commission communication to the Council entitled 'A New Impetus for Consumer Protection Policy', which was approved by resolution of the Council on 6 May 1986 (⁶), lists in paragraph 37, among the measures proposed by the Commission, the harmonization of legislation on packages;

Whereas tourism plays an increasingly important role in the economies of the Member States; whereas the package system is a fundamental part of tourism; whereas the package travel industry in Member States would be stimulated to greater growth and productivity if at least a minimum of common rules were adopted in order to give it a Community dimension; whereas this would not only produce benefits for Community citizens buying packages organized on the basis of those rules, but would attract tourists from outside the Community seeking the advantages of guaranteed standards in packages;

Whereas disparities in the rules protecting consumers in different Member States are a disincentive to consumers in one Member State from buying packages in another Member State;

Whereas this disincentive is particularly effective in deterring consumers from buying packages outside their own Member State, and more effective than it would be in relation to the acquisition of other services, having regard to the special nature of the services supplied in a package which generally involve the expenditure of substantial amounts of money in advance and the supply of the services in a State other than that in which the consumer is resident;

Whereas the consumer should have the benefit of the protection introduced by this Directive irrespective of whether he is a direct contracting party, a transferee or a member of a group on whose behalf another person has concluded a contract in respect of a package;

Whereas the organizer of the package and/or the retailer of it should be under obligation to ensure that in descriptive matter relating to packages which they respectively

(¹) OJ No C 96, 12. 4. 1988, p. 5.
(²) OJ No C 69, 20. 3. 1989, p. 102 and
   OJ No C 149, 18. 6. 1990.
(³) OJ No C 102, 24. 4. 1989, p. 27.
(⁴) OJ No C 165, 23. 6. 1981, p. 24.
(⁵) OJ No C 115, 30. 4. 1984, p. 1.

(⁶) OJ No C 118, 7. 3. 1986, p. 28.

A-135

(Rel. 18)

A-136                    TRAVEL LAW

organize and sell, the information which is given is not misleading and brochures made available to consumers contain information which is comprehensible and accurate;

Whereas the consumer needs to have a record of the terms of contract applicable to the package; whereas this can conveniently be achieved by requiring that all the terms of the contract be stated in writing of such other documentary form as shall be comprehensible and accessible to him, and that he be given a copy thereof;

Whereas the consumer should be at liberty in certain circumstances to transfer to a willing third person a booking made by him for a package;

Whereas the price established under the contract should not in principle be subject to revision except where the possibility of upward or downward revision is expressly provided for in the contract; whereas that possibility should nonetheless be subject to certain conditions;

Whereas the consumer should in certain circumstances be free to withdraw before departure from a package travel contract;

Whereas there should be a clear definition of the rights available to the consumer in circumstances where the organizer of the package cancels it before the agreed date of departure;

Whereas if, after the consumer has departed, there occurs a significant failure of performance of the services for which he has contracted or the organizer perceives that he will be unable to procure a significant part of the services to be provided; the organizer should have certain obligations towards the consumer;

Whereas the organizer and/or retailer party to the contract should be liable to the consumer for the proper performance of the obligations arising from the contract; whereas, moreover, the organizer and/or retailer should be liable for the damage resulting for the consumer from failure to perform or improper performance of the contract unless the defects in the performance of the contract are attributable neither to any fault of theirs nor to that of another supplier of services;

Whereas in cases where the organizer and/or retailer is liable for failure to perform or improper performance of the services involved in the package, such liability should be limited in accordance with the international conventions governing such services, in particular the Warsaw Convention of 1929 in International Carriage by Air, the Berne Convention of 1961 on Carriage by Rail, the Athens Convention of 1974 on Carriage by Sea and the Paris Convention of 1962 on the Liability of Hotelkeepers; whereas, moreover, with regard to damage other than personal injury, it should be possible for liability also to be limited under the package contract provided, however, that such limits are not unreasonable;

Whereas certain arrangements should be made for the information of consumers and the handling of complaints;

Whereas both the consumer and the package travel industry would benefit if organizers and/or retailers were

placed under an obligation to provide sufficient evidence of security in the event of insolvency;

Whereas Member States should be at liberty to adopt, or retain, more stringent provisions relating to package travel for the purpose of protecting the consumer.

HAS ADOPTED THIS DIRECTIVE:

*Article 1*

The purpose of this Directive is to approximate the laws, regulations and administrative provisions of the Member States relating to packages sold or offered for sale in the territory of the Community.

*Article 2*

For the purposes of this Directive:

1. 'package' means the pre-arranged combination of not fewer than two of the following when sold or offered for sale at an inclusive price and when the service covers a period of more than twenty-four hours or includes overnight accommodation:

   (a) transport;

   (b) accommodation;

   (c) other tourist services not ancillary to transport or accommodation and accounting for a significant proportion of the package.

   The separate billing of various components of the same package shall not absolve the organizer or retailer from the obligations under this Directive;

2. 'organizer' means the person who, other than occasionally, organizes packages and sells or offers them for sale, whether directly or through a retailer;

3. 'retailer' means the person who sells or offers for sale the package put together by the organizer;

4. 'consumer' means the person who takes or agrees to take the package ('the principal contractor'), or any person on whose behalf the principal contractor agrees to purchase the package ('the other beneficiaries') or any person to whom the principal contractor or any of the other beneficiaries transfers the package ('the transferee');

5. 'contract' means the agreement linking the consumer to the organizer and/or the retailer.

*Article 3*

1. Any descriptive matter concerning a package and supplied by the organizer or the retailer to the consumer, the price of the package and any other conditions applying to the contract must not contain any misleading information.

**APPENDIX U**                    A-137

2.   When a brochure is made available to the consumer, it shall indicate in a legible, comprehensible and accurate manner both the price and adequate information concerning:

(a) the destination and the means, characteristics and categories of transport used;

(b) the type of accommodation, its location, category or degree of comfort and its main features, its approval and tourist classification under the rules of the host Member State concerned;

(c) the meal plan;

(d) the itinerary;

(e) general information on passport and visa requirements for nationals of the Member State or States concerned and health formalities required for the journey and the stay;

(f) either the monetary amount or the percentage of the price which is to be paid on account, and the time-table for payment of the balance;

(g) whether a minimum number of persons is required for the package to take place and, if so, the deadline for informing the consumer in the event of cancellation.

The particulars contained in the brochure are binding on the organizer or retailer, unless:

— changes in such particulars have been clearly communicated to the consumer before conclusion of the contract, in which case the brochure shall expressly state so,

— changes are made later following an agreement between the parties to the contract.

*Article 4*

1. (a) The organizer and/or the retailer shall provide the consumer, in writing or any other appropriate form, before the contract is concluded, with general information on passport and visa requirements applicable to nationals of the Member State or States concerned and in particular on the periods for obtaining them, as well as with information on the health formalities required for the journey and the stay;

(b) The organizer and/or retailer shall also provide the consumer, in writing or any other appropriate form, with the following information in good time before the start of the journey:

(i) the times and places of intermediate stops and transport connections as well as details of the place to be occupied by the traveller, e.g. cabin or berth on ship, sleeper compartment on train;

(ii) the name, address and telephone number of the organizer's and/or retailer's local representative or, failing that, of local agencies on

whose assistance a consumer in difficulty could call.

Where no such representatives or agencies exist, the consumer must in any case be provided with an emergency telephone number or any other information that will enable him to contact the organizer and/or the retailer;

(iii) in the case of journeys or stays abroad by minors, information enabling direct contact to be established with the child or the person responsible at the child's place of stay;

(iv) information on the optional conclusion of an insurance policy to cover the cost of cancellation by the consumer or the cost of assistance, including repatriation, in the event of accident or illness.

2.   Member States shall ensure that in relation to the contract the following principles apply:

(a) depending on the particular package, the contract shall contain at least the elements listed in the Annex;

(b) all the terms of the contract are set out in writing or such other form as is comprehensible and accessible to the consumer and must be communicated to him before the conclusion of the contract; the consumer is given a copy of these terms;

(c) the provision under (b) shall not preclude the belated conclusion of last-minute reservations or contracts.

3.   Where the consumer is prevented from proceeding with the package, he may transfer his booking, having first given the organizer or the retailer reasonable notice of his intention before departure, to a person who satisfies all the conditions applicable to the package. The transferor of the package and the transferee shall be jointly and severally liable to the organizer or retailer party to the contract for payment of the balance due and for any additional costs arising from such transfer.

4. (a) The prices laid down in the contract shall not be subject to revision unless the contract expressly provides for the possibility of upward or downward revision and states precisely how the revised price is to be calculated, and solely to allow for variations in:

— transportation costs, including the cost of fuel,

— dues, taxes or fees chargeable for certain services, such as landing taxes or embarkation or disembarkation fees at ports and airports,

— the exchange rates applied to the particular package.

(b) During the twenty days prior to the departure date stipulated, the price stated in the contract shall not be increased.

5.   If the organizer finds that before the departure he is constrained to alter significantly any of the essential

A-138                          TRAVEL LAW

terms, such as the price, he shall notify the consumer as quickly as possible in order to enable him to take appropriate decisions and in particular:

— either to withdraw from the contract without penalty,

— or to accept a rider to the contract specifying the alterations made and their impact on the price.

The consumer shall inform the organizer or the retailer of his decision as soon as possible.

6. If the consumer withdraws from the contract pursuant to paragraph 5, or if, for whatever cause, other than the fault of the consumer, the organizer cancels the package before the agreed date of departure, the consumer shall be entitled:

(a) either to take a substitute package of equivalent or higher quality where the organizer and/or retailer is able to offer him such a substitute. If the replacement package offered is of lower quality, the organizer shall refund the difference in price to the consumer;

(b) or to be repaid as soon as possible all sums paid by him under the contract.

In such a case, he shall be entitled, if appropriate, to be compensated by either the organizer or the retailer, whichever the relevant Member State's law requires, for non-performance of the contract, except where:

(i) cancellation is on the grounds that the number of persons enrolled for the package is less than the minimum number required and the consumer is informed of the cancellation, in writing, within the period indicated in the package description; or

(ii) cancellation, excluding overbooking, is for reasons of force majeure, i.e. unusual and unforeseeable circumstances beyond the control of the party by whom it is pleaded, the consequences of which could not have been avoided even if all due care had been exercised.

7. Where, after departure, a significant proportion of the services contracted for is not provided or the organizer perceives that he will be unable to procure a significant proportion of the services to be provided, the organizer shall make suitable alternative arrangements, at no extra cost to the consumer, for the continuation of the package, and where appropriate compensate the consumer for the difference between the services offered and those supplied.

If it is impossible to make such arrangements or these are not accepted by the consumer for good reasons, the organizer shall, where appropriate, provide the consumer, at no extra cost, with equivalent transport back to the place of departure, or to another return-point to which the consumer has agreed and shall, where appropriate, compensate the consumer.

*Article 5*

1. Member States shall take the necessary steps to ensure that the organizer and/or retailer party to the contract is liable to the consumer for the proper performance of the obligations arising from the contract, irrespective of whether such obligations are to be performed by that organizer and/or retailer or by other suppliers of services without prejudice to the right of the organizer and/or retailer to pursue those other suppliers of services.

2. With regard to the damage resulting for the consumer from the failure to perform or the improper performance of the contract, Member States shall take the necessary steps to ensure that the organizer and/or retailer is/are liable unless such failure to perform or improper performance is attributable neither to any fault of theirs nor to that of another supplier of services, because:

— the failures which occur in the performance of the contract are attributable to the consumer,

— such failures are attributable to a third party unconnected with the provision of the services contracted for, and are unforeseeable or unavoidable,

— such failures are due to a case of force majeure such as that defined in Article 4 (6), second subparagraph (ii), or to an event which the organizer and/or retailer or the supplier of services, even with all due care, could not foresee or forestall.

In the cases referred to in the second and third indents, the organizer and/or retailer party to the contract shall be required to give prompt assistance to a consumer in difficulty.

In the matter of damages arising from the non-performance or improper performance of the services involved in the package, the Member States may allow compensation to be limited in accordance with the international conventions governing such services.

In the matter of damage other than personal injury resulting from the non-performance or improper performance of the services involved in the package, the Member States may allow compensation to be limited under the contract. Such limitation shall not be unreasonable.

3. Without prejudice to the fourth subparagraph of paragraph 2, there may be no exclusion by means of a contractual clause from the provisions of paragraphs 1 and 2.

4. The consumer must communicate any failure in the performance of a contract which he perceives on the spot to the supplier of the services concerned and to the organizer and/or retailer in writing or any other appropriate form at the earliest opportunity.

This obligation must be stated clearly and explicitly in the contract.

## APPENDIX U

### Article 6

In cases of complaint, the organizer and/or retailer or his local representative, if there is one, must make prompt efforts to find appropriate solutions.

### Article 7

The organizer and/or retailer party to the contract shall provide sufficient evidence of security for the refund of money paid over and for the repatriation of the consumer in the event of insolvency.

### Article 8

Member States may adopt or return more stringent provisions in the field covered by this Directive to protect the consumer.

### Article 9

1. Member States shall bring into force the measures necessary to comply with this Directive before 31 December 1992. They shall forthwith inform the Commission thereof.

2. Member States shall communicate to the Commission the texts of the main provisions of national law which they adopt in the field governed by this Directive. The Commission shall inform the other Member States thereof.

### Article 10

This Directive is addressed to the Member States.

Done at Luxembourg, 13 June 1990.

For the Council
The President
D. J. O'MALLEY

A-140                 TRAVEL LAW

*ANNEX*

Elements to be included in the contract if relevant to the particular package :

(a) the travel destination(s) and, where periods of stay are involved, the relevant periods, with dates ;

(b) the means, characteristics and categories of transport to be used, the dates, times and points of departure and return ;

(c) where the package includes accommodation, its location, its tourist category or degree of comfort, its main features, its compliance with the rules of the host Member State concerned and the meal plan ;

(d) whether a minimum number of persons is required for the package to take place and, if so, the deadline for informing the consumer in the event of cancellation ;

(e) the itinerary ;

(f) visits, excursions or other services which are included in the total price agreed for the package ;

(g) the name and address of the organiser, the retailer and, where appropriate, the insurer ;

(h) the price of the package, an indication of the possibility of price revisions under Article 4 (4) and an indication of any dues, taxes or fees chargeable for certain services (landing, embarkation or disembarkation fees at ports and airports, tourist taxes) where such costs are not included in the package ;

(i) the payment schedule and method of payment ;

(j) special requirements which the consumer has communicated to the organiser or retailer when making the booking, and which both have accepted ;

(k) periods within which the consumer must make any complaint concerning failure to perform or improper performance of the contract.

Exhibit 4

**Opinion of Mr Advocate General Tizzano delivered on 17 January 2002 Club-Tour, Viagens e Turismo SA v Alberto Carlos Lobo Gonçalves Garrido, and Club Med Viagens Ld. Reference for a preliminary ruling: Tribunal Judicial da Comarca do Porto - Portugal. Directive 90/314/EEC - Package travel, package holidays and package tours - Definition of 'package travel and 'pre-arranged'. Case C-400/00.**

**Advocate Generals Opinion**

1. By order of 31 October 2000, received at the Court Registry on 20 November, the 8o Juízo Cível da Comarca do Porto (8th Civil District of the Oporto Local Court, Portugal), pursuant to Article 234 EC, referred two questions to the Court for a preliminary ruling concerning the interpretation of Directive 90/314/EEC, in connection with a case brought by a travel agency against a customer who refused to pay the agency for the service provided due to the serious discomfort suffered during the course of a holiday at a hotel complex. The national court seeks to ascertain whether the concept of a package holiday, which defines the scope of the directive, also includes customised packages, that is packages organised at the request and on the initiative of the consumer or a strictly defined group of consumers in accordance with their specific wishes.

I - Legal background

A - Directive 90/314/EEC

2. The purpose of the directive is to approximate the laws, regulations and administrative provisions of the Member States relating to packages sold or offered for sale in the territory of the Community (Article 1).

3. Article 2 of the directive provides that:

For the purposes of this Directive:

(1) "package" means the pre-arranged combination of not fewer than two of the following when sold or offered for sale at an inclusive price and when the service covers a period of more than twenty-four hours or includes overnight accommodation:

(a) transport;

(b) accommodation;

(c) other tourist services not ancillary to transport or accommodation and accounting for a significant proportion of the package.

The separate billing of various components of the same package shall not absolve the organiser or retailer from the obligations under this Directive;

(2) "organiser" means the person who, other than occasionally, organises packages and sells or offers them for sale, whether directly or through a retailer;

(3) "retailer" means the person who sells or offers for sale the package put

together by the organiser;

(4) "consumer" means the person who takes or agrees to take the package ("the principal contractor"), or any person on whose behalf the principal contractor agrees to purchase the package ("the other beneficiaries") or any person to whom the principal contractor or any of the other beneficiaries transfers the package ("the transferee");

(5) "contract" means the agreement linking the consumer to the organiser and/or the retailer.

4. Article 3 of the directive provides that:

1. Any descriptive matter concerning a package and supplied by the organiser or the retailer to the consumer, the price of the package and any other conditions applying to the contract must not contain any misleading information.

2. When a brochure is made available to the consumer, it shall indicate in a legible, comprehensible and accurate manner both the price and adequate information concerning:

(a) the destination and the means, characteristics and categories of transport used;

(b) the type of accommodation, its location, category or degree of comfort and its main features, its approval and tourist classification under the rules of the host Member State concerned;

(c) the meal plan;

(d) the itinerary;

(e) general information on passport and visa requirements for nationals of the Member State or States concerned and health formalities required for the journey and the stay;

(f) either the monetary amount or the percentage of the price which is to be paid on account, and the timetable for payment of the balance;

(g) whether a minimum number of persons is required for the package to take place and, if so, the deadline for informing the consumer in the event of cancellation.

The particulars contained in the brochure are binding on the organiser or retailer, unless:

- changes in such particulars have been clearly communicated to the consumer before conclusion of the contract, in which case the brochure shall expressly state so,

- changes are made later following an agreement between the parties to the contract.

5. Under Article 4 of the directive:

1. (a) The organiser and/or the retailer shall provide the consumer, in writing or any other appropriate form, before the contract is concluded, with general information on passport and visa requirements applicable to nationals of the Member State or States concerned and in particular on the periods for obtaining them, as well as with information on the health formalities required for the journey and the stay;

(b) The organiser and/or retailer shall also provide the consumer, in writing or any other appropriate form, with the following information in good time before the start of the journey:

(i) the times and places of intermediate stops and transport connections as well as details of the place to be occupied by the traveller, e.g. cabin or berth on ship, sleeper compartment on train;

(ii) the name, address and telephone number of the organiser's and/or retailer's local representative or, failing that, of local agencies on whose assistance a consumer in difficulty could call.

Where no such representatives or agencies exist, the consumer must in any case be provided with an emergency telephone number or any other information that will enable him to contract the organiser and/or the retailer;

(iii) in the case of journeys or stays abroad by minors, information enabling direct contact to be established with the child or the person responsible at the child's place of stay;

(iv) information on the optional conclusion of an insurance policy to cover the cost of cancellation by the consumer or the cost of assistance, including repatriation, in the event of accident or illness.

2. Member States shall ensure that in relation to the contract the following principles apply:

(a) depending on the particular package, the contract shall contain at least the elements listed in the Annex;

(b) all the terms of the contract are set out in writing or such other form as is comprehensible and accessible to the consumer and must be communicated to him before the conclusion of the contract; the consumer is given a copy of these terms;

(c) the provision under (b) shall not preclude the belated conclusion of last-minute reservations or contracts.

3. Where the consumer is prevented from proceeding with the package, he may transfer his booking, having first given the organiser or the retailer reasonable notice of his intention before departure, to a person who satisfies all the conditions applicable to the package. The transferor of the package and the transferee shall be jointly and severally liable to the organiser or retailer party to the contract for payment of the balance due and for any additional costs arising from such transfer.

4. (a) The prices laid down in the contract shall not be subject to revision unless the contract expressly provides for the possibility of upward or downward revision and states precisely how the revised price is to be calculated, and solely to allow for variations in:

- transportation costs, including the cost of fuel,

- dues, taxes or fees chargeable for certain services, such as landing taxes or embarkation or disembarkation fees at ports and airports,

- the exchange rates applied to the particular package.

(b) During the 20 days prior to the departure date stipulated, the price stated in the contract shall not be increased.

…

6. On the basis of the annex to the directive, amongst the Elements to be included in the contract if relevant to the particular package are the special requirements which the consumer has communicated to the organiser or retailer when making the booking, and which both have accepted (letter (j)).

B - National provisions

7. Amongst the instruments transposing the directive into Portuguese law is Decree Law No 209/97 of 13 August 1997 which governs the access to and the operation of the activities of travel agencies. Article 17 of that decree law includes in the concept of tourist travel not only packages, as defined in Article 2(1) of the directive (see Article 17(2) of the Decree Law), but also customised holidays, that is prepared at the request of the client to meet the needs stated by him (Article 17 (3)).

II - Facts of the case and questions referred for a preliminary ruling

8. Mr Alberto Carlos Lobo Gonçalves Garrido had purchased a holiday package from Club-Tour, Viagens e Turismo S.A. (hereinafter Club-Tour), a travel agency which specialises in the organisation and sale of package travel, including airline tickets and accommodation for two weeks, at full board, at a Greek hotel complex known as Club Med Gregolimano, at a price of PTE 1 692 928, of which PTE 1 155 860 was for accommodation at the abovementioned hotel complex.

9. For Mr Garrido's holiday, Club-Tour contacted the travel agency Club Med

Viagens Lda (hereinafter Club Med), and purchased from it the stay at Club Med Gregolimano. It was therefore Club Med which made the necessary reservations at the hotel complex in Gregolimano (accommodation, meals and transfers) and prepared the programme, publicised it and set the inclusive price.

10. On arrival at the hotel complex, the Garrido family were unpleasantly surprised to find it infested with thousands of wasps which prevented them from enjoying their holiday for the whole duration of their stay. In addition, the immediate request by Mr Garrido to be transferred to another complex could not be met by Club-Tour, as Club Med, which Club Tour contacted for that purpose, stated that they were unable to offer a valid alternative for that time.

11. In view of the above, on his return to Portugal Mr Garrido refused to pay the price agreed with Club-Tour. Club-Tour then brought an action before the 8th Civil District of the Oporto Local Court seeking that Mr Garrido be ordered to pay the amount due. In support of its claim, the agency challenged in particular the applicability of the directive to this case on the grounds that, in its view, the service offered in that situation could not be described as a pre-arranged combination within the meaning of Article 2(1) of the directive.

12. Given that, as shown in its preamble, the intention of the directive is to protect the consumer of tourism services by making the operators and travel agents responsible for losses due to improper performance of the contractual obligations, and on the assumption that the national law must be interpreted and applied in accordance with the directive, the 8th Civil District of the Oporto Local Court referred the following questions to the Court for a preliminary ruling:

(1) Does a package organised by the agency, at the request and on the initiative of the consumer or a strictly defined group of consumers in accordance with their wishes, including transport and accommodation through a tourism undertaking, at an inclusive price, for a period of more than 24 hours or including overnight accommodation, fall within the scope of the concept of "package travel" as defined in Article 2(1)?

(2) May the expression "pre-arranged" which appears in the directive be interpreted as referring to the moment when the contract is entered into between the agency and the customer?

III - Legal analysis

A - First question

13. In the first question, the national court asks, essentially, whether the concept of package in Article 2(1) of the directive also includes customised package holidays, that is to say, tourism services which are organised at the request and on the initiative of the consumer or a strictly defined group of consumers in accordance with their wishes and therefore not fixed in advance unilaterally by the travel agencies.

14. First of all, I must point out that all the parties which presented observations in these proceedings, namely the Portuguese, Austrian, Belgian, Spanish and French Governments, and also the Commission, were in agreement that a positive answer should be given to the question at issue, on the basis of arguments which I shall now set out and with which I am fully in agreement.

15. First, it is observed that that answer results from the text of the provision under discussion, which defines in broad terms the concept of a package, a concept from which nothing suggests that customised holidays are excluded, or that they should be treated differently as compared with the general rules. Under Article 2(1) of the directive, for a service to be described as a package, it is sufficient, firstly, that the combination of tourist services sold by a travel agency at an inclusive price includes two of three components which, under that provision, are the main features of those services (that is, transport, accommodation and other tourist services not ancillary to transport or accommodation and accounting for a significant proportion of the package), and secondly, that the service exceeds 24 hours or includes an overnight stay. On the other hand, the directive does not require the service to be the result of a proposal by the agency to the customer, or that it should correspond to a rigid plan, except for the aspects indicated; any changes to that plan made at the request of the individual consumer do not therefore appear in themselves capable of changing those characteristics which define the concept at issue.

16. In confirmation of the above, various Governments and the Commission rightly recalled that in its judgment in Rechberger the Court confirmed that according to Article 2(1) of the directive, all that is needed to constitute a package is the pre-arranged combination of at least two of the three components mentioned in that paragraph, when sold or offered for sale at an inclusive price (paragraph 29), so that the fact that the payment due from the consumer corresponds to only one of the components of the service does not preclude the application of the directive. Not only that, but the Court went on to say that there is no basis in the text of the directive for limiting its scope to packages offered to a potentially unlimited number of consumers and that it would be contrary to the purpose of the directive to do so. In order for the directive to apply, it is sufficient if the package is sold or offered for sale within the territory of the Community at an inclusive price and includes at least two of the components mentioned in Article 2(1) of the directive (paragraph 31).

17. As various Governments have emphasised, the judgment in AFS is to the same effect, a case in which the Court gave a ruling with reference to a service for which the applicability of Article 2(1) of the directive had been called in doubt, as the stay was of long duration and provided free of charge (it was travel as part of a student exchange programme). On that occasion, after pointing out again that the concept of the package does not require all the components stated in Article 2(1) of the directive to be present, the Court stated firstly that the fact that the service was provided for consideration does not constitute an essential element of that concept (paragraph 26) and secondly, that while the accommodation included in package travel (is) normally of relatively short duration, that duration cannot be regarded as a defining element, as the directive, which applies to any travel

exceeding 24 hours, [does not provide for] any maximum duration (paragraph 27).

18. In support of that interpretation, some Governments and the Commission also mentioned the preparatory work for the directive and the amendments which were made during the course of that work to Article 2(1), specifically to broaden the concept of package service or travel at an inclusive price as compared with the original proposal by the Commission of 23 March 1988. While in the original proposal the concept of package included only the pre-arranged combination of not less than two of the following when organised at a global price now, as we have seen, package means the pre-arranged combination of not fewer than two of the following when sold or offered for sale at an inclusive price. This essentially confirms that the Community legislature intentionally chose to move from the concept of a service designed and offered for sale without any intervention from the consumer to a concept which does not allow the exclusion of a customised service, that is sold in accordance with the particular needs of a given consumer. But that is not all. Again, in the original proposal by the Commission, organiser was defined as the person who, in the course of his business, organises the package and offers it by means of brochures or other forms of advertising, to the public generally, thus clearly meaning that the package corresponded to pre-arranged models, described and advertised in brochures. However, in the final text, as a result of concerns expressed by the European Parliament and the Economic and Social Committee, which considered that definition to be too restrictive of the scope of the directive, the provision defines the organiser as the person who, other than occasionally, organises packages and sells or offers them for sale, whether directly or through a retailer.

19. In a 1999 report on the implementation of the directive, which is also mentioned by the parties several times, the Commission had emphasised, among other things, the changes made to the directive during the preparatory work, deducing that even though the text of Article 2(1) of the directive is not explicit in that sense, it would be difficult to argue that the provision does not also include customised packages, given that the requirements to protect the consumer are the same for customised holidays and holidays prepared in advance by the organiser.

20. The Commission also noted, however, that a systematic reading of the directive bears out that point. Pursuant to Article 4(2)(a) depending on the particular package, the contract shall contain at least the elements listed in the Annex to the directive. In (j) of the Annex it is stated that amongst the elements to be included in the contract if relevant to the particular package are the special requirements which the consumer has communicated to the organiser or retailer when making the booking, and which both have accepted. This means that, before the contract is entered into, the consumer can inform the travel agency or organiser of special wishes or specific requirements and that, for that reason, he is not obliged to accept only the pre-arranged combination proposed by them. The Austrian Government also added that there are already many organisers who offer modules of tourism services which can be combined depending on the requirements of the customers, just as there are packages organised in advance which can be changed again on the basis of the specific needs of a particular customer at the time of booking.

21. Over and above those considerations, however, which in my view are decisive, the parties have been at one in emphasising that, even though the text of the provision and the preparatory work were still to leave some doubt, that doubt is finally dispelled if it is borne in mind that the interpretation of the directive in question must be inspired by a criterion which is not restrictive in any way, in order to ensure that the consumer has the broadest protection possible. The judgments of the Court in the cases already mentioned, AFS and Rechberger, are, I believe, clearly orientated to that view, but I should point out that I too have espoused it recently in my Opinion in the Leitner case, linking that criterion of interpretation not only to the systematic analysis of the text and the aims of the directive, but also to the fact that it was adopted pursuant to Article 100a (now, after amendment, Article 95 EC), the third paragraph of which requires that harmonisation measures on consumer protection be based on a high level of protection. An interpretation of Article 2(1) of the directive which goes against the line suggested here would mean a reduction of consumer protection for the whole spectrum of customised travel.

22. The above observations by the parties participating in these proceedings appear to me, as I anticipated, to be wholly defensible. Consequently I propose that the first question should be given a positive answer.

B - Second question

23. In the second question the referring court asks whether the expression pre-arranged combination which appears in Article 2(1) of the directive may be interpreted as referring to the moment when the contract is entered into between the agency and the customer.

24. Taking into account the solution suggested for the first question, that is, that the concept of the package includes customised travel, all the parties agree that the question should receive a positive response, with the exclusion, stated by the Spanish Government, of services which are agreed at the place of the service or tourist destination.

25. It seems to me that the observations of the parties can be espoused on this point too. Given that amongst the tourism services included in the scope of the directive are also those which arise from organisation in consultation between the agency and the individual customer, and that this consultation may be extended until the moment the parties reach agreement, and therefore until the contract is entered into, the expression pre-arranged combination can only have the meaning indicated in the question under discussion. On the other hand, a tourism service does not cease being a package within the meaning of the directive solely because the consumer makes his special requirements known to the organiser when making the booking [see (j) of the Annex to the directive].

26. The French Government and the Commission also noted that in the 1999 report, referred to above, the Commission had suggested the removal of the term pre-arranged, which was thought to be ambiguous and a source of uncertainty. If we consider, as I do, that the directive also includes customised holidays, that is

those whose details can be finalised close to or on the occasion of the contract being entered into, that term does indeed appear to be superfluous.

27. In conclusion, I hold the view that a positive answer should also be given to the second question.

IV - Conclusion

28. For the reasons set out above, I therefore propose that the Court declare that:

(1) Packages organised by agencies, at the request and on the initiative of the consumer or a strictly defined group of consumers in accordance with their wishes, including transport and accommodation in a tourism complex, at an inclusive price, for a period of more than 24 hours or including overnight accommodation, fall within the scope of Article 2(1) of Council Directive 90/314/EEC of 13 June 1990 on package travel, package holidays and package tours.

(2) The expression pre-arranged combination which appears in Article 2(1) of Directive 90/314/EEC may be interpreted by reference to the moment, when the contract is entered into between the agency and the customer.

| | |
|---|---|
| **Document Number** | 62000C0400 |
| **Document Author** | Court of Justice of the European Communities |
| **Document Type** | Conclusions |
| **Enabling Treaty** | European Economic Community |
| **Publication Reference** | European Court reports 2002 Page I-04051 |
| **Date of Document** | 2002/01/17 |
| **Date Case Lodged** | 2000/11/03 |
| **Juridicial Citations** | 31990L0314 : N 1 2 |
| | 31990L0314-A02 : N 3 |
| | 31990L0314-A02PT1 : N 12 13 15 21 23 28 |
| | 31990L0314-A03 : N 4 |
| | 31990L0314-A04 : N 5 |
| | 61997J0140 : N 16 |
| | 61997J0237 : N 17 |
| | 62000C0168 : N 21 |
| **Subject Matter** | Approximation of laws ; Consumer protection |
| **Authoritative Language** | Italian |
| **Country of Origin** | Portugal |
| **Proceedings** | Reference for a preliminary ruling |
| **Advocate General** | Tizzano |
| **Judge-Rapporteur** | Gulmann |

**DATES**         of document: 2002/01/17
                  of application: 2000/11/03

Exhibit 5



**Consumer Affairs**

Important legal notice

English

EUROPA > European Commission > DG Health and Consumer Protection > Consumer
Affairs > Safeguarding Consumers' Interests > Ensuring Safe Shopping > Package Travels

Contact | AZ-Index | Search | What's
New? | Subscribe | Site map | Home

| Overview of Consumer Policy | Consumer Safety: Products and Services | Safeguarding Consumers' Interests | Enforcing Consumer Protection Rules | Redress: Asserting Consumer Rights | Working together with Consumer Organisations | International Consumer Issues | Consumer Information and Education Activities | Tenders and Grants |
|---|---|---|---|---|---|---|---|---|

Package Travel

printable version

**NEW : Commission Working Document on package travel, package holidays and package tours.**

The travel sector has evolved considerably in recent years. The development of the internet, the entry of low cost
air carriers, the growth within the cruise industry and the increasing trend of consumers putting together their
own holiday components from different organisers, instead of opting for packages pre-arranged by an organiser
or a retailer, are some factors that need to be considered when reviewing the **Council Directive 90/314/EEC** on
package travel, package holidays and package tours.

The purpose of this **Commission Working Document** [pdf] is to set out the main regulatory problems in the
area of package travel and to consult stakeholders on issues related to the Directive.

The Commission wishes to collect stakeholders' views on the application of the Directive and its suitability for
new market conditions and/or products. All interested parties are welcome to submit their replies to the questions
by 1 October 2007. After the consultation period has ended, the Commission will publish a summary of the
responses on this website.

The Package Travel Directive is one of eight directives covered by the **Review of the Consumer Acquis**.
Horizontal issues affecting several directives have been consulted on separately by the Green Paper on the
Review of the Consumer Acquis. In the light of the outcome of the consultation on the Green Paper and the input
to the consultation in this working document, the Commission will consider the need for a reform of the Directive.

Speeches
Press Releases
Events
Links



**The Council Directive 90/314/EEC on package travel, package holidays and package tours**

The Directive is designed to protect consumers who contract package travel in the EU. It covers the sale of a
pre-arranged combination: Consumers are covered where, at least, two of these elements are sold or offered for
sale at an inclusive price and the service covers a period of more than twenty-four hours or includes over-night
accommodation.

The Directive contains rules concerning the liability of package organisers and retailers, who must accept
responsibility for the performance of the services offered. There are some exceptions, for example cases of
"force majeure", or similar circumstances which could be neither foreseen nor overcome. However, even in these
cases the organiser must use his best endeavours to help consumers. The amount of compensation payable
may be subject to certain limits but not to an unreasonable degree.

The Directive also prescribes rules on the information that must be given to consumers at different points in time.
It contains specific requirements with regard to the content of brochures, where these are issued. For example,
any brochure made available to consumers must indicate clearly and accurately the price, destination, itinerary
and the means of transport used, type of accommodation, meal plan, passport and visa requirements, health
formalities, timetable for payment and the deadline for informing consumers in the event of cancellation.

Consumers are entitled to cancel the contract if the organiser seeks to change the essential elements of the
arrangements agreed. During the 20 days prior to departure the price stated in the contract cannot be increased.

There are provisions specifying the consumers' rights if, after departure, a significant proportion of the services
contracted for is not provided or the organiser and/or retailer fail to perform in line with his obligations arising
from the contract.

The Directive also contains provisions on the security to be provided by operators and covering repayment of the
price and repatriation of consumers in the event of the operator's insolvency.

Exhibit 6

1/29/07

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

                                    SUPERIOR COURT
                                    Civil Action No. 02-0585G

—————————————————————X

LAURA FORST, Individually and as
Personal Representative of the Estate of
EUGENIA FORST, deceased, and
JANNA SILVERGLADE,

                        Plaintiffs,        DECLARATION OF ALEXANDER
                                     ANOLIK IN SUPPORT OF
                                     PLAINTIFFS' OPPOSITION TO
                                     DEFENDANTS' THIRD RENEWED
                                     MOTION FOR SUMMARY
                                     JUDGMENT

v.

FRANCA FRANZAROLI and MICHAEL
A. LAURANO, as Trustees of DONNA
FRANCA TOURS MASSACHUSETTS
BUSINESS TRUST, and GENERAL
TRAVEL, INC. d/b/a DONNA FRANCA
TOURS.

                        Defendants.

—————————————————————X

        I, Alexander Anolik, declare as follows:

        1.      I am an expert in travel and tourism, specifically travel industry standards,

customs, practices and expectations.

        2.      I am the author of the first travel law text for the industry entitled *The Law and*

*The Travel Industry.*  For approximately 30 years, I have lectured to tour operators, travel agents,

and consumers on Preventive Legal Care®, a theme in the travel industry that I developed.  Over

the last 30 years, I have taught tens of thousands of travel industry personnel.

        3.      Although my texts have primarily targeted travel industry professionals, I have

recently published a full consumer source book called *Traveler's Rights: Your Legal Guide to Fair Treatment and Full Value* that is presently sold by Amazon.com, Barnes & Noble, Borders, and other major book distributors. Other textbooks that I have written for tour and coach operators, and travel agents includes *Travel, Tourism and Hospitality Law* which is a basic text for vocational travel schools and junior colleges. I have also almost completed a textbook for the university circuit on behalf of Prentice Hall. A complete new text book should be published by the end of the year utilizing the original text named *The Law and The Travel Industry, 5th Edition*. I also co-authored *The Official Outside Sales Manual* which is the most widely sold handbook for outside travel agents in the industry. I have also authored *The Official Travel Agent's Handbook* which is comprised of forms and legal theories for travel agents on behalf of The Association of Retail Travel Agents (ARTA), the largest agent-only organization. I am still their General Counsel and have counseled, taught for them, and advised them for over 15 years.

4.    The American Society of Travel Agents (ASTA) is the largest trade association in the United States and includes thousands of travel agents and tour and coach operators. For a number of years, I was ASTA's litigation counsel and performed and lectured to thousands of their agents as one of its travel industry litigation counsel.

5.    As the former general travel law counsel to *Travel Trade Magazine*, I taught in conjunction with and attended numerous trade shows over my 30 years of experience. I also had a Preventive Legal Care® column for *Travel Weekly* and I was the travel law writer on Preventive Legal Care® subjects for *Travel Agent Magazine* for a long period of time until I left for other industry assignments.

6.    My website, www.travellaw.com, has videos of some of my national appearances

2

on *Dateline MSNBC, Inside Edition, 60 minutes, 48 Hours*, and other television programs where
I have frequently been a commentator on various issues in the travel industry. Some of these
include appearances regarding custom and practice issues such as the responsibilities of the
consumer /traveler as well as the responsibilities of the tour operator.

      7.    I have prepared several taped seminars including my *Issue and Answer* series and
have presented hundreds of half-day and full-day seminars to refresh the travel industry on
Preventive Legal Care® issues. I have spoken in the past on current trends and conservatism in
risk management to prevent injuries and to prevent litigation against agents and tour and coach
operators when injuries do occur.

      8.    I am a co-founder of The International Forum of Travel and Tourism Advocates
(IFTTA). This is an international organization comprised of attorneys emphasizing travel and
tourism law in approximately 40 countries. IFTTA conducts annual conférences to discuss
trends and various legal issues in the industry. The organization is made up of scholars, insurance
personnel, the in-house counsel of numerous tour operators, and general counsel, as well as
tourism officials handling legal aspects for various governments. In 2003, I spoke at the first
IFTTA and The United Federation of Travel Agents' Associations (UFTTA) Convention in
Monaco. UFTTA is comprised of European, Canadian, African and Middle Eastern tour
operators and agents. In 2005, I also gave a presentation and chaired a session for IFTTA at the
Vienna Conference on Risk Management during Crisis Situations and Natural Disasters.

      9.    I have also represented, lectured and taught at the International Tour Management
Institute (ITMI). The International Tour Management Institute is the largest supplier and trainer
of tour escorts, managers or directors in the world. In my work with this organization, I have

taught coach operators, drivers, and guides.

10.    I have represented several tour agencies including Arthur Fromer Tours, Maupin Tours, Trafalgar Tours, Perillo Tours, Allitalia's La Adventura program, EAC, a wholesale Italian supplier of motor coaches to other tour operators, as well as many other tour operators.

11.    I am also the travel industry attorney for the California Travel & Tourism Commission.

12.    I have attended insurance defense conferences and am acquainted with numerous insurance defense risk management teams.

13.    I have lectured and written policy papers for the National Tour Association, an organization that develops tour standards in the United States.  One of these policy papers written outlined the standards for tour operators' compliance with the Americans With Disabilities Act.

14.    I am a member of the California State Bar and Washington, DC Bar and admitted to practice before a number of Federal District Courts, the US Tax Court, and the US Supreme Court.

15.    I have been a consultant to the travel industry on Risk Management and Crisis Management throughout the US, Europe, Asia, and the Americas.

16.    Internationally, I am familiar with The Overland Transport Treaty, which holds that companies wishing to operate as carriage of passengers by road, shall meet the requirement of professional competence. *See* Title II, A. Common Provisions, Article 5 1.(c)).  Professional competence includes the duty to provide a safe tour and to professionally handle all crisis situations that may arise during the tour.

17.    I am familiar with, have worked with and compared the travel industry standards

4

in the United States, Europe and Italy. The standards for EU nations including Italy apply to tours being conducted in Europe and these standards are more stringent than the standards for tours in the United States, but the custom and practice for U.S. tour operators in Italy still requires specialized care. In Italy, the mere factor that the tour operator uses an independent ground operator or an independent contractor as the tour guide does not absolve the tour operator of the standard of care for an upscale travel package. European standards have been tightened because of the EU legal requirements regarding "proper tours." Custom and practice in the travel industry in Europe does not allow the tour planner and operator to offload responsibility for the tour.

18.    Liability for tour operators in Europe is governed by the EU Travel Directive which has a "proper tour" standard. This is basically a strict liability standard. Article 12 of the European Travel Directive (UNIDROIT) establishes that the travel organizer shall be responsible for the acts and omissions of the employees (Tour Manager) and agents when acting in the course of their employment or within the scope of their authority. The tour operator or the travel agent is liable for the proper performance of the travel services contract, regardless of who was responsible to deliver the special services. The tour operator or travel agent is responsible for the acts and omissions of the tour escort and driver. Article 13 of the European Travel Directive establishes that the travel organizer shall be held liable for loss or damage caused to the traveler as a result of non-performance. Article 15 of the European Travel Director sets forth that when a travel organizer entrusts to a third party the provision of transportation, he shall be liable for any loss or damage caused to the traveler. I have reviewed and worked with the directives and regulations above in order to help advise the industry on what is and must be the custom and

practice in the industry.

     19.    After reviewing the deposition of Franca Franzaroli, Laura Forst, Janna Silverglade, and Giacomo Gramegna, I have sufficient factual information regarding this case to make this declaration.

     20.    In the travel industry, a first-class or luxury tour means a tour with upscale service and care with an emphasis on accommodating the tour participants' special needs including the needs of older passengers.   These tours include additional physical assistance and an additional physical presence.

     21.    In the travel industry, an escorted tour means a tour of additional care and higher standards than less inclusive packaging.

     22.    When dealing with the elderly on a luxury, escorted tour, or first class tour, the industry standards require additional observation, preparation, care and comfort and physical assistance.

     23.    I have extensive experience dealing with the custom and practices surrounding tour managers, guides and escorts.  There is no standard of basic care duties or distinction between a tour manager, tour escort, or tour director.  They are basically all the same person. The tour escort, manager, or director is the person designated as the leader of the group usually for the entire travel experience.  This definition presumes that they are responsible for the safety of the tour participants.

     24.    The tour guide and/or tour driver is part of the ethos of the tour especially when the tour manager is identified by signs as part of the tour or when there are signs in or on the coach.  You could also have additional people like "local" tourist guides or accompany guides at

6

specific attractions or areas, such as Rome or it's province, for traffic or local cultural issues.

25.     In my expert opinion, Mr. Gramegna was functioning as part of the First Class Donna Franca Tour package of Donna Franca Tours. I believe that Donna Franca Tours was exercising control over the tour manager in exercising control over his appearance and position.

26.     Accidents are very common when people are disembarking a tour coach. More accidents occur when disembarking coaches than in automobile collisions. In order to become a tour escort or guide, the training from the International Tour Management Institute, where I have lectured, includes instruction on how to assist passengers off the coaches. This training mandates that there be someone at the bottom of the stairs to assist the passengers getting off of the coach. This is not only to assist the passenger, but also to help break the fall or catch the person in the event of an accident.

27.     Industry standards in both the United States and Italy require that someone be waiting at the bottom of the steps to make sure that the participants get off the coach safely. Not having someone waiting at the bottom of the steps on this type of tour as Mrs. Forst was disembarking the coach was below industry standards in both the U.S. and Italy. This was also below the standard of care in the industry for even a lower value package tour in both the U.S. and Italy. There definitely should have been someone waiting below to make sure that Mrs. Forst got off the coach safely. It is the custom and practice in the travel industry to have someone at the bottom of the steps of this type of the helping the participants off of the coach in both the U.S. and Italy. This was not a city transportation bus, this was a tour "coach."

28.     In my opinion, Donna Franca Tours and its tour manager, Mr. Gramegna, were negligent for leaving the tour participants and going to take care of hotel reservations instead of

7

helping the tour participants disembark the coach. The guide should have waited to arrange the matter with the hotel or should have called ahead to arrange the arrival, so that he could "accommodate" the senior passengers on the tour.

29.    Under European law, a Tour Operator is responsible for its employees and independent contractors. Under European law, Donna Franca Tours is also responsible for any negligence by the driver of the bus for not assisting passengers. The driver should also have cared for passengers unloading prior to absenting himself from the exiting passengers.

30.    People who have been riding in a coach for a long distance are least stable on their legs when they get up to exit the coach. After sitting in a coach, they do not yet have their "land legs." Because passengers exiting may not have yet had their "land legs," both the tour manager and driver should have been helping the tour participants exiting the coach at each door.

31.    Accidents disembarking a coach are so common that in Rome, travel companies are required to have an additional guide on a coach to assist the passengers, the drivers and the on-coach tour guides.

32.    Donna Franca Tours should have notified the coach driver and the tour guide that seniors were on the tour. Donna Franca Tours should have specifically instructed the tour manager and the bus driver regarding their responsibility to assist passengers exiting the motorcoach.

33.    Many Americans are accustomed to kneeling buses. If Donna Franca advertised her coaches as luxury or deluxe air-conditioned motor-coaches, she should have warned her American tour participants that this did not include a kneeling coach.

34.    Donna Franca Tours should have had a risk management and a crisis management

8

procedures manual to ensure that Mrs. Forst's did not fall and to assist her family afterwards.

These materials should have been provided to tour escort and driver.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 29, 2007
San Francisco, California

Alexander Anolik

9